IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TANEISHA BEDENFIELD,

                    Plaintiff,

          vs.                                         Case No. 19-2658-SAC

UNITED PARCEL SERVICE, INC.,

                    Defendant.

MEMORANDUM AND ORDER

          This employment discrimination case comes before the court on

defendant United Parcel Service, Inc,'s ("UPS's") motion for summary judgment (ECF#

34) on the plaintiff Taneisha Bedenfield's ("Bedenfield's") remaining claims under

Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title

VII") for hostile work environment (sexual harassment), retaliation, and sex

discrimination (constructive discharge). UPS hired Bedenfield on October 31, 2017,

and when she resigned on December 5, 2018, she worked as a "part-time preloader."

ECF# 33, Pretrial Order, Stipulations 2-4. Her claims are based on two separate

incidents of alleged sexual harassment. The first happened in January of 2018 when a

co-worker repeatedly placed his hands on her waist and then touched her backside.

The second incident happened at an employee meeting on June 29, 2018, when a

female co-worker came up from behind and sexually assaulted her in the presence of

others. Bedenfield claims that both co-workers had histories which were known to

UPS and that UPS failed to respond and take prompt corrective action addressing

these situations and reducing risk of recurrence. UPS seeks summary judgment

arguing it promptly investigated each incident and promptly took effective actions that prevented both co-workers from sexually harassing Bedenfield again.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding the motion, the court's role is "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. The court may grant summary judgment for lack of a genuine issue when the evidence is insufficient "for a jury to return a verdict," when "the evidence is merely colorable," or when the evidence "is not significantly probative." *Id.* It follows then that a genuine issue for trial exists when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden is met "by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler*, 144 F.3d at 671. The burden then shifts to the nonmovant to "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational fact finder could find for the nonmovant." *Id.* (internal quotation marks and

citations omitted). Such facts "must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id*.

The court applies this standard drawing all inferences arising from the record in the nonmovant's favor. *Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1216 (10th Cir. 2003). The court does not make credibility determinations or weigh the evidence; these are jury functions. *Id*. at 1216. The Tenth Circuit has counseled the following for summary judgment proceedings in employment discrimination cases:

> [I]n the context of employment discrimination, "[i]t is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind." *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995). Many of the highly fact-sensitive determinations involved in these cases "are best left for trial and are within the province of the jury." *Id*.; *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("[T]he inquiry [at summary judgment is] whether the evidence presents a sufficient disagreement to require submission to a jury...."). Consequently, "in this Circuit . . . an employment discrimination suit will always go to the jury so long as the evidence is sufficient to allow the jury to disbelieve the employer's [explanation for the alleged misconduct]." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1177 (10th Cir. 1998) (Tacha, J., concurring in part); *see Randle*, 69 F.3d at 452 ("[I]f . . . inferential evidence is sufficient to allow a plaintiff to prevail at trial, it is surely sufficient to permit a plaintiff to avoid summary judgment so that the plaintiff can get to trial.").

*Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1220-21 (10th Cir. 2015).

**CLAIMS**

In the pretrial order, under the title of "Sex Discrimination & Harassment & Hostile Environment," the plaintiff seeks relief under Title VII claiming that she "was subjected to unfavorable terms, conditions, and privileges of employment . . . because of" her sex, and that defendant "failed to respond to Plaintiff's requests to address and remedy this." ECF# 33, p. 9. She also claims that "[t]his discriminatory treatment was ongoing, continuous, repeated, severe, and

pervasive and thereby created a hostile environment." *Id.* She further claims that the "discriminatory treatment and hostile environment interfered with Plaintiff's ability to effectively do her job and was intended to force Plaintiff to resign and she reasonably felt compelled to do so." *Id.* Also in the pretrial order, but under the title of "Retaliation," the plaintiff seeks relief under Title VII claiming that because of her protected conduct of making internal complaints and reports to UPS, she "has been subjected to repeated and ongoing acts, conduct, and practices UPS which were intended to and would easily dissuade an individual from engaging in this protected conduct." *Id.* at p. 10. In sum, the plaintiff appears to be alleging Title VII claims for general discrimination based on sex, hostile work environment based on sexual harassment, constructive discharge, and retaliation. As will be discussed later, the plaintiff is less than clear as to what constitutes her general discrimination claim.

**FACTS**

The court finds the following statement of facts to be uncontroverted after considering the parties' objections and citations and after reviewing the actual exhibits submitted. The court's reasons for its findings and rulings on any objections will only be explained when the facts are central to the summary judgment decision. Otherwise, the court regards its reasons and rulings on all matters to be evident from whether and how the facts are stated herein and from the actual contents of the submitted exhibits.

Throughout her employment with UPS, Bedenfield worked at UPS's James Street Center in Kansas City, Kansas, as a preloader, sorting packages to be loaded onto UPS vehicles for customer delivery. Her typical work shift started at

midnight and ended between 6 and 10 am. Preloaders work in one of five different areas at the James Street facility moving between areas based on the kind of packages to be sorted on a given day. Thus, preloaders are not typically assigned to a single sorting area but move to different areas as needed on that day.

January 2018 Incident with Coworker Anthony

During one shift, Bedenfield's supervisor sent her over to another area needing help. This work required her to sort packages coming down a slide into the correct cages. She was standing at the end of the slide, and there were other co-workers standing there also sorting packages in the area. One of them was Anthony. Bedenfield did not know Anthony and had not seen him before. This was the first and only time she would work with him.

In her deposition, Bedenfield describes Anthony as crowding into her space. He shuffled from one side to her other side brushing up against her as he did. This happened two or three times. When he placed his hands on her hips at one point, she asked Anthony if he wanted to switch positions and told him not to touch her as he moved around her. Bedenfield testified she did not know why Anthony was touching her hips as he moved around to reach for packages. A short time later, Bedenfield felt Anthony "hand palm" her "ass." ECF# 35-2, p. 22. Bedenfield said she became visibly upset by this, and Anthony began apologizing and saying, "I'm sorry." *Id.* at pp. 24-25. About that same time, a supervisor walked up asking if anyone wanted to go home early, and Bedenfield said that she did. So, she left work without telling anyone what had happened. Bedenfield testified that Anthony never asked her out or appeared to want a romantic or personal relationship with her. When asked if

she thought that Anthony had touched her for sexual gratification or something like that, Bedenfield answered, "Why else would he touch me." *Id.* at p. 26. Bedenfield also testified that Anthony never said anything to her about this incident.

When asked if she was aware of any other complaints against Anthony for inappropriate touching or harassing conduct, Bedenfield related a conversation shortly after the incident with a coworker Shauna who said Anthony had "been doing that for a while now." ECF# 35-2, p. 28. This testimony is inadmissible hearsay if offered to prove the fact that Anthony did have prior incidents. This ruling is confirmed by Bedenfield also testifying that she had no personal knowledge of any "prior incidents in which [Anthony] harassed or mistreated any other employees." *Id.* at p. 51-52.

Bidenfield eventually reported Anthony's behavior several days later during a conversation with her part-time supervisor Tom Stolte. When Stolte asked her to change assigned areas and help in the same area as Anthony, Bedenfield for the first time told Stolte about Anthony touching her "ass." ECF# 35-2, pp. 31-33. Bedenfield described the incident but did not tell Stolte that she felt harassed by Anthony's conduct. *Id.* at 33. Bedenfield said that Stolte seemed to be shocked by the news and told her to go back to her original work area and did not require her to work in Anthony's area. Not long after that, a full-time supervisor, Alex Case, asked Bedenfield to work in Anthony's area. She told Case what had happened with Anthony and that she did not want to work in his area. Case also did not require Bedenfield to work in that area, but Case did report her complaint to the Human Resources ("HR") manager Eric Day.

Day directed Case to get written statements from Stolte and Bedenfield. In her signed statement dated February 16, 2018, Bedenfield wrote:

> Last week I was working on charge 1 and I had a very uncomfortable experience with one of the guys who was also working on that charge. I believe his name is Barry. It was my first time meeting him. He spoke to me a lot even though I didn't respond much. While we worked he seemed to always be very close to me no matter how much space I tried to put between us, if I moved to the right, he moved right, if I went to the left, he moved left. He was so close I could practically smell his breath. On several occasions he moved around me, touching me, as if it were not much room for him to get around me. On one of the times he went around me he touched my butt then apologized saying it was a mistake. I wasn't sure if believed him and it made me very uncomfortable. I would prefer not to have to work with him going forward.

ECF# 35-8. After getting this statement, HR staff interviewed Bedenfield about the incident, and Bedenfield testified to being able to tell her side of the story during this interview. Bedenfield acknowledged that she did not know who else was interviewed during the investigation of her allegation, whether the investigation's outcome corroborated her allegation, and what discipline, if any, was imposed on Anthony as a result of the investigation.

HR Manager Day interviewed Stolte and other possible witnesses to the incident, but none were able to corroborate Bedenfield's allegation that Anthony had touched her inappropriately, crowded her personal space, or harassed her in violation of UPS policy. This statement appears in Day's declaration under penalty of perjury ECF# 35-1, ¶ 10, and the plaintiff does not effectively dispute it with any citation to evidence of record. Day had other HR staff interview Anthony who denied improperly touching or harassing coworkers. Day also avers being unaware of any prior allegations of harassment being made against Anthony while at UPS. The plaintiff's deposition testimony does not controvert Day's averment. Even though no other evidence was

found to substantiate Bedenfield's allegations against Anthony, Day directed the management team to not assign Bedenfield again to work in Anthony's area. During each of the employee interviews conducted during the investigation, Day reminded the employee of the company's anti-harassment, anti-discrimination, and anti-retaliation policies. The plaintiff has not effectively disputed Day's averments. Anthony was specifically warned that any harassing conduct in violation of UPS policy would be disciplined with possible termination.

After this incident, Bedenfield said she was never again asked to work in Anthony's area. Bedenfield testified that her negative opinion about any investigation into her allegation is because she was not told what, if anything, was done. Bedenfield, however, testified that following this incident HR personnel contacted her three different times to check in on how things were going. Bedenfield related that she told HR that Anthony had come to her area a couple times, once to pick up irregular packages when Bedenfield's supervisor stepped in front of her and the other time Anthony asked the supervisor for the time. Bedenfield did not describe either time as involving harassment or any verbal or physical contact between her and Anthony.

June 2018 Incident with Coworker Parker

Before this incident, Bedenfield had interacted with her female coworker Ms. Parker several times, but Parker had never improperly touched or harassed her. Bedenfield also testified that she never associated with Parker outside of work. On June 29, 2018, the preloaders and some supervisors from the five areas were having their pre-shift meeting or huddle during which assignments were given

and safety issues were discussed. Along with the others, Bedenfield was completing a form when she felt a hand slide between her legs and grab at her "vagina." ECF# 35-2, p. 104. Bedenfield turned around and seeing Parker pushed her away. Parker forced herself back onto Bedenfield and "grabbed her ass." ECF# 40-1, p. 4 (Plaintiff's Declaration under Penalty of Perjury and EEOC Charge). Bedenfield took hold of Parker's wrists and yelled at Parker to stop while keeping her back. Parker tried to get closer while puckering her lips into a kissing motion and repeating "booty . . . in a child-like voice." *Id*. Despite Bedenfield and a supervisor Cheyenne yelling at Parker to stop, she continued but then stopped suddenly and walked away. *Id*. Other coworkers and supervisors were present at the meeting when this incident occurred, and one supervisor came up afterwards and said, "what the fuck was that?" *Id*. This incident and the reactions of others was disturbing to Bedenfield. *Id*.

Several minutes later, the plaintiff ran into Alex Case, a manager, and told him what had happened. He instructed her to proceed to her assigned work area. Shortly thereafter, Case came to Bedenfield and asked, "Now what happened again." ECF# 40-1, p. 4. Bedenfield gave Case another verbal report and then gave a written complaint to HR before leaving work for the day. The HR staff said to Bedenfield, "not again." Her written complaint reads:

> On today, June 29th 2018 (Friday) I was approached from behind by Porsha Parker. Upon her approach she slid her hand between my thighs in a "wiping motion" that prompted me to immediately turn around in defense mode. I turned abruptly and pushed her away as she continued her advances. She pushed her way back into my personal space and grabbed my behind. During the entire altercation she repeatedly said the word "Booty." After she touched my butt I grabbed both of her wrists and continued to try pushing her away as well as asking her to stop. I worked in the mental/behavioral health field for 14 years as a Rehabilitation Assistant and because of the extensive training and experience I could tell that she was not mentally stable. Although I was upset I

> stayed as calm as I could as not to provoke any other (violent) behaviors. She started trying to kiss . . . after I grabbed her wrists putting distance between us. She did not stop until Cheyenne had called her name at least five times. Seemingly in a more normal state of mind, Porsha apologized to me about 20 minutes after the incident ended. I just nodded.

ECF# 35-13.

Bedenfield testified that during the incident she noticed Parker's pupils were dilated and that from experience she knew this indicated someone could be under the influence of alcohol or drugs. Bedenfield believed Parker was under "the influence of something" based on her behavior. ECF# 35-2, p. 59-60. Bedenfield also testified she does not believe that Parker targeted her for a particular reason but that it just happened she was the "target that day. It could have been anybody." *Id.* at p. 61.

In the days following the incident, Bedenfield did not see Parker at work and asked Case a couple times about what was happening. Case said there would be meeting with HR about this. Bedenfield then met with HR manager Day and learned that Parker would not be at work for some time but that they would be giving her the option of completing treatment or being terminated. Day indicated they did not have Parker's decision. When Bedenfield expressed personal concerns about not feeling safe, Day told her that Parker would not be allowed on premises until completing treatment.

Shortly after the incident, Parker told the management team that she would seek treatment through the Employee Assistance Program ("EAP") under the collective bargaining agreement. Parker was sent home immediately. She was notified later that she could not return to work until she had satisfactorily completed

10

treatment through the EAP program. From Parker's healthcare provider, UPS's HR received reports that Parker had completed both inpatient and outpatient treatment, had been discharged from the program after successfully completing it, and was fit to return to work. Bedenfield testified to having no personal knowledge about UPS's investigation and outcome of this employment matter other than what Day had told her earlier about the condition requiring Parker's treatment before returning to work. None of the plaintiff's citations controvert these facts.

When Parker returned to work about a month later, HR directed that Bedenfield would not be required again to work in the same area as Parker. Bedenfield learned from a supervisor about this restriction. Bedenfield, however, testified that she witnessed Parker come into her work area on almost a daily basis and that she saw Parker waiting in the parking lot for a ride from another coworker. Bedenfield said that it made her uncomfortable and feel unsafe when Parker came into her work area and that she said something to her supervisor about that. Not only during these instances, but at all other times too, Parker did not work in Bedenfield's area, did not say anything to her, and did not touch her. Bedenfield was not aware of any other incident when Porter touched her or touched any other UPS employee inappropriately except for the June 29th incident. Nor was Bedenfield aware of any other incidents when Parker harassed other UPS employees.

Bedenfield feels like UPS should have "done more" and "done better" than what it did in addressing this situation after the assault and Parker's return to work. ECF# 40-2, pp. 40-41. Bedenfield faults UPS for not keeping her informed with

what was going on and what they were doing to handle the situation and protect her.
She testified:

> Who wouldn't feel attacked if somebody had just assaulted them? All of a sudden, a month and half pops up later and is hanging out in the parking lot? For all I know, she could be upset because she couldn't work for a while or, you know, whatever. So I think it could have been done better.

*Id*. at 41-42. Bedenfield said that Anthony and Parker were the only UPS employees to sexually harass her.

When asked why her UPS employment ended, Bedenfield answered because she "wanted to end it" and agreed it was her "voluntary intent" to end her employment. ECF# 35-2, p. 75. Bedenfield explained that she wanted to end her employment, because she "couldn't take the uncertainty . . . [she] was feeling as to how things would play out with the Portia [Parker] situation." *Id*. Bedenfield also went to HR right after Parker returned to work and discussed how Parker was coming into her area and could be seen lingering in the parking lot. This would have been in July or early August. Bedenfield felt unsafe at work. It bothered her that Tammy, the HR representative with whom she spoke, did know about her situation and the earlier reported assault. This was the last time that Bedenfield spoke with HR about what was happening with Parker. Tammy gave Bedenfield some information about the EAP program. After that meeting, Bedenfield did not raise any further complaints with HR, through the helpline, or with her supervisors, and she did not file any union grievance.  Bedenfield stopped coming to work November 28, 29, and 30 of 2018 and told her supervisor Cheyenne that she "didn't know if . . . [she] could handle the way things were going." ECF# 35-2, p. 79.

Bedenfield testified to being aware of a prior unusual workplace incident involving Parker that happened a month before the June assault. Bedenfield was working when it happened, but she only saw Parker being taken out by the ambulance crew and did not see anything before that. Bedenfield heard from coworkers that Parker had been naked in one of the cages. Bedenfield was shocked that UPS had allowed Parker to return to work after this.

## DISCUSSION

In its motion, UPS seeks summary judgment first on the plaintiff's sex discrimination, constructive discharge, and retaliation claims arguing the plaintiff cannot establish *prima facie* cases and cannot create a genuine issue of material fact of pretext over UPS's legitimate non-discriminatory reasons for its actions. UPS then addresses the plaintiff's sexual harassment allegations under her hostile work claim. In response, the plaintiff believes sufficient evidence exists for a jury to find that she was subjected to severe sexual harassment, that UPS failed to respond properly, and that its failure to respond to her reports and complaints of harassment constitutes retaliation. The plaintiff further argues she has created genuine pretextual issues over the UPS's articulated business reasons based on inconsistencies and implausible explanations.

Under Title VII, it is unlawful "to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A Title VII plaintiff "can prove discrimination in several different ways, including proof of a hostile work

environment or disparate treatment." *Throupe v. U. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021).

At summary judgment, the plaintiff must "present either direct evidence of discrimination or indirect evidence that satisfies the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)." *Bekkem v. Wilkie*, 915 F.3d 1258, 1267 (10th Cir. 2019). The plaintiff argues her claims under the *McDonnell Douglas* framework. This means the "plaintiff must first raise a genuine issue of material fact on each element of the prima facie case, as modified to relate to differing factual situations." *Bekkem*, 915 F.3d at 1267 (internal quotation marks and citation omitted). "The burden then shifts to the employer to offer a legitimate nondiscriminatory reason for its employment decision." *Id.* "If the employer does so, the burden then reverts to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual—i.e., unworthy of belief." *Id.* At this last stage, the court is to "consider the evidence of pretext in its totality." *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 884 (10th Cir. 2018).

A prima facie case of discrimination "must consist of evidence that (1) the victim belongs to a protected class; (2) the victim suffered an adverse employment action; and (3) the challenged action took place under circumstances giving rise to an inference of discrimination." *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007). This burden of making a prima facie case "is not onerous," "is one of production, not persuasion," and "involve[s] no credibility assessment." *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005) (internal quotation marks and citations

14

omitted). This burden serves primarily to eliminate "the most common nondiscriminatory reasons" for the adverse employment action, but it still must function as a critical inquiry into "whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination." *Id*. at 1099-1100 (internal quotation marks and citations omitted). To make a prima facie case of retaliation, a plaintiff must show: "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1219 (10th Cir. 2013).

Adverse Employment Actions

UPS takes issue with the plaintiff's ability to show adverse employment action for her discrimination and retaliation claims. In considering this issue, the court is mindful of the following:

> "Although the Tenth Circuit liberally defines an 'adverse employment action,' its existence is determined on a case by case basis and does not extend to a mere inconvenience or an alteration of job responsibilities." *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir.2000) (internal quotation marks omitted). To be an adverse action, the employer's conduct must be "materially adverse" to the employee's job status. *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir.1998); *see Aquilino v. Univ. of Kansas*, 268 F.3d 930, 934 (10th Cir.2001) (indicating that adverse action must be "a significant change in employment status, such as ... firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998))).

*Wells v. Colorado Dept. of Transp.*, 325 F.3d 1205, 1212–13 (10th Cir. 2003). In retaliation cases, adverse action is liberally construed. *Tabor*, 703 F.3d at 1219-20; *see Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir.1998) (adverse

15

employment action is "liberally interpreted" and courts are to follow "a case-by-case approach to determining whether a given employment action is adverse.").

UPS first argues that the plaintiff cannot show an adverse employment action for either her discrimination or retaliation claims. Of the three general categories for adverse employment actions, the plaintiff's claims are focused on "unbearable changes in job conditions such as hostile work environment or conditions amounting to constructive discharge." *Clancy v. Esper*, 2020 WL 618584, at *6 (D. Kan. Feb. 10, 2020) (citing *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453-54 (7th Cir. 2011)), *aff'd*, 837 Fed. Appx. 630 (10th Cir. Dec. 8, 2020), *petition for certiorari filed* (No. 20-7399, Mar. 4, 2021). "Coworker hostility or retaliatory harassment constitutes an adverse employment action only if it is sufficiently severe." *Medina v. Income Support Div., New Mexico*, 413 F.3d 1131, 1136 (10th Cir. 2005). It appears then that the plaintiff's discrimination claim is actually the same as her hostile work environment claim based on coworkers' sexual harassment which requires her to prove that "'the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *Lounds v. Lincare, Inc.*, 812 F.3d at 1222 (quoting *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007)). The court will address the plaintiff's hostile work environment claim later and, in particular, whether "the alleged harassment was sufficiently pervasive or severe to alter the terms, conditions, or privileges of her employment." *Id.* The plaintiff does assert constructive discharge claim which also will be addressed later separately. The plaintiff has not come forward with any other discrimination claims for adverse employment actions.

For her retaliation claim, the plaintiff must show a reasonable employee would have found the employer's challenged action was materially adverse. Using the Supreme Court's words, the plaintiff must show that the employer's action "well might have dissuaded a reasonable work from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). The plaintiff asserts the retaliatory adverse actions were "UPS failing to properly respond to her complaints and the unlawful conduct she was subject to." ECF# 40, p. 28. More specifically, the plaintiff regards UPS's alleged failure to investigate her complaints and to communicate with her about any investigation were adverse employment actions. The plaintiff has failed to create any genuine issue of material fact over what the defendant has shown as its reasonable investigation and handling of her complaints. Other than the plaintiff preferring that the defendant would have terminated Anthony and Parker, the plaintiff does not show how the defendant's handling of either incident would dissuade a reasonable employee from complaining about sexual harassment. The plaintiff points to no authority recognizing that an employer's failure to disclose the results of its investigation and discipline taken against another employee could constitute a materially adverse employment action under any circumstances resembling this case. The plaintiff's speculation is not enough to create a genuine issue of material fact over whether a reasonable employee in her position would be dissuaded from filing a harassment complaint against a coworker because the employer will not disclose the results of its investigation into the coworker or because the employer may decide not to terminate the coworker.

With both incidents, she submitted written complaints against coworkers to HR, and she was interviewed about her complaints. She also learned subsequently that her supervisors were told not to have her work in the same areas as these coworkers. She observed her supervisors follow through on these orders. After both incidents, she never worked with those coworkers and never had verbal or physical contact with them. The defendant's HR staff had contact with the plaintiff after both incidents, and there is no evidence or claim that she was deterred from raising any personal concerns. The plaintiff points to a single conversation in August of 2018 with Tammy in HR who claimed to know nothing about the plaintiff's situation. The plaintiff, however, offers no evidence that she reasonably requested the defendant to take additional measures to allay her safety concerns and that the defendant denied her requests. Additionally, from the evidence concerning what the plaintiff told the defendant, there is not a reasonable inference that the defendant knew the plaintiff believed she was being harassed and chose to ignore her complaints. Nor does the plaintiff show that management orchestrated any harassment or knew about the harassment and acquiesced in it as to condone and encourage it. *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998). The court finds nothing in these circumstances that rises to a material adverse employment action.

Even if the plaintiff had shown an adverse employment action, UPS has shown it took remedial actions on both incidents based on the circumstances known to it. The plaintiff has not shown she could meet her burden of showing pretext with proof that UPS's reasons are false or unworthy of credence. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002). The inquiry at this stage is not

whether the employer's stated reasons were "wise, fair or correct," but whether the employer "honestly believed those reasons and acted in good faith upon those beliefs." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 971 (10th Cir. 2017) (internal quotation marks and citation omitted). The evidence of record stands uncontroverted that UPS believed and acted in good faith on what it knew about both incidents at the time. The plaintiff's speculative opinions and citation of unrelated cases involving UPS are inadmissible evidence. Her conclusory arguments and references to UPS policy do not show how UPS failed to follow any of its policies regarding discipline or the disclosure of confidential information on employees. "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Bekkem*, 915 F.3d at 1268 (internal quotation marks and citation omitted). The defendant is entitled to summary judgment on this retaliation claim.

Constructive Discharge

UPS seeks summary judgment as the plaintiff cannot meet her substantial burden of showing her resignation was the result of a constructive discharge. UPS points out that the plaintiff admitted in her deposition that she voluntarily resigned because she could not take the "uncertainty." ECF# 35-2, p. 75. UPS specifically emphasizes that Bedenfield admitted she ended her employment because she "wanted to" and because it was her "voluntary intent" to do so. ECF# 35-2, p. 75. UPS also challenges the plaintiff's evidence as failing to show a jury issue over whether a reasonable person in her position would feel compelled to resign due to any alleged discriminatory actions by UPS.

The Tenth Circuit recently summarized the basic principles governing a claim of constructive discharge:

> "Constructive discharge is an adverse employment action." *Strickland v. United Parcel Serv.*, 555 F.3d 1224, 1230 n.4 (10th Cir. 2009); *see Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980 (10th Cir. 2008) ("Even if an employee resigns, the plaintiff may still satisfy the adverse employment action requirement by demonstrating that he was constructively discharged."). "A claim of constructive discharge ... has two basic elements[:] [F]irst that [the plaintiff] was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign. ... [Second,] that he actually resigned." *Green v. Brennan*, ––– U.S. ––––, 136 S. Ct. 1769, 1777, 195 L.Ed.2d 44 (2016). "Essentially, a plaintiff must show that she had no other choice but to quit. The conditions of employment must be objectively intolerable[.]" *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir. 1998) (citation and internal quotation marks omitted). "If an employee resigns of her own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged." *Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005).

*Rivero v. Bd. of Regents of U. of New Mexico*, 950 F.3d 754, 761 (10th Cir. 2020). It is for Bedenfield to prove that UPS so discriminated against her that a reasonable person in her place would have felt compelled to resign. She has not come forward with evidence showing she could carry this burden. Moreover, the court cannot find in her summary judgment memorandum anything that meaningfully responds directly to UPS's arguments. Bedenfield's own testimony confirms that she had dealt with these vague feelings of uncertainty and fear for some time which did not otherwise affect her work routine and environment other than complaining one time immediately after Parker returned to work. As Bedenfield said, she voluntarily decided to leave because she no longer wanted to deal with the situation. A constructive discharge claim does not arise simply from the employee feeling dissatisfied with the employer's disciplinary decision. Without evidence to sustain a constructive discharge claim, the plaintiff cannot avoid summary judgment.

Hostile Work Environment

           A hostile work environment claim is "composed of a series of separate acts that collectively constitute one unlawful employment practice." *Nat. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). To sustain such a claim, the plaintiff must show "(1) she was discriminated against because of her sex, and (2) that the discrimination was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Delsa Brooke Sanderson v. Wyoming Highway Patrol*, 976 F.3d 1164, 1174 (10th Cir. 2020). To show the first element that the defendant was motivated by the plaintiff's sex, "a plaintiff may point to acts of harassment that are 'facially sex based.'" *Throupe v. University of Denver*, 988 F.3d at 1251 (quoting *Sanderson*, 976 F.3d at 1174). And, "[i]f a jury could reasonably infer the conduct was related to the plaintiff's sex, 'then it is for the fact finder to decide whether such an inference should be drawn.'" *Id*. For the second element, the plaintiff cannot just rely on her perception of the conduct being severe or pervasive, and instead, "must 'show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, or insult.'" *Id. quoting Sanderson*, 976 F.3d at 1176). "So, 'the run-of-the mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim.'" *Id*. (quoting *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012)). "And 'a few isolated incidents" of discriminatory conduct does not make the harassment pervasive." *Id*. (quoting *Morris*, 666 F.3d at 666). Finally, "An employer can be held liable if its employees create a hostile work

21

environment and 'it knew or should have known about the conduct but failed to stop it.'" *Throupe,* 988 F.3d 1243, 1251 (10th Cir. 2021) (quoting *Bertsch v. Overstock.com,* 684 F.3d 1023, 1027 (10th Cir. 2012), *abrogated on other grounds by Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166 (10th Cir. 2018)).

Bedenfield claims that she was sexually harassed both by Anthony and Parker and that Parker's conduct was even a sexual assault all of which affected a term or condition of her employment due to its severity. Bedenfield stresses that the single incident of Parker's conduct was sufficiently severe to create a hostile work environment in that it was objectively threatening and abusive. She also argues her deposition testimony shows Anthony and Parker "had a history of and propensity of and for unlawful and dangerous behavior." ECF# 40, p. 32. She contends UPS was "grossly negligent and failed to take prompt corrective action in response" to her complaints and in not terminating Parker or Anthony but allowing them back to work and not keeping them from having contact with her. *Id.*

"If a sexually hostile work environment claim is based on the employer's alleged negligence or recklessness in addressing a non-supervisory co-worker's harassment, the plaintiff must also prove that the employer 'had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment.'" *Jackson v. Kansas City Kansas Public Schools Unified School District No. 500*, 799 Fed. Appx. 586, 590-91 (10th Cir. Jan. 7, 2020) (unpub.) (quoting *Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007)), *cert. denied*, 140 S. Ct. 2834 (2020). The Tenth Circuit has explained:

> To survive summary judgment, the plaintiff has the burden of presenting
> evidence establishing a genuine issue of fact that her employer knew about the

22

> sexual harassment and that its response was unreasonable. *See Ford v. West*, 222 F.3d 767, 776 (10th Cir. 2000). A plaintiff can show actual knowledge by showing she "reported harassment to management-level employees" and can show constructive knowledge if "the pervasiveness of sexual harassment can properly lead to an inference of knowledge." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 673 (10th Cir. 1998). To show that the employer's response was inadequate, the plaintiff must show that it was not "reasonably calculated to end the harassment." *Id.* at 676 (quotation omitted).

*Jackson,* 799 Fed. Appx. at 591. The reasonableness of an employer's response to a complaint of harassment is judged by "whether the remedial and preventative action was reasonably calculated to end the harassment." *Adler*, 144 F.3d at 676 (quotation omitted). It is the plaintiff's "burden of presenting evidence establishing a genuine issue of fact that the employer's response was unreasonable." *Ford*, 222 F.3d at 776. If the harassment stops immediately, this evidences that the employer's response was reasonably calculated. *Jackson*, 799 Fed. Appx at 591.

UPS seeks summary judgment as the plaintiff lacks any admissible evidence that UPS's response to her complaints was unreasonable. That the plaintiff believes both Anthony and Parker should have been terminated is her opinion, but she lacks personal knowledge about UPS's findings, conclusions and corrective actions taken as a result of its investigations. The plaintiff did not depose any UPS witness about these matters leaving her with no evidence that UPS's response was unreasonable under the circumstances. As UPS points out, Bedenfield's written complaints did not directly refer to either incident as sexual harassment. Nonetheless, UPS investigated the Anthony incident and was unable to corroborate her complaint. As for Parker, she pursued EAP treatment and was not allowed back to the workplace until a physician found her fit to return. UPS took remedial measures: reminded Anthony of the anti-harassment policies and warned him of disciplinary

23

consequences for any such conduct in the future; placed a restriction on Anthony and Parker ever being assigned to work in the same area as Bedenfield; and kept open channels for reporting any future or ongoing problems. In her deposition, the plaintiff admitted that neither employee ever again spoke to her or touched her inappropriately. At most, the plaintiff observed both employees occasionally walk into her work area without saying anything to her. UPS reiterates that the evidence establishes its remedial actions were reasonably calculated to end any future harassing conduct as evidenced by Bedenfield never again experiencing anything that resembled harassment.

The record fully confirms UPS's position on taking a reasonable response actions based on what it knew, on what Bedenfield reported, and on what it should have known under the circumstances. UPS investigated the Anthony incident as a first-time harassment complaint which Anthony denied during the investigation but which UPS further investigated and found no corroborating evidence. The plaintiff's arguments and evidence are not such that a reasonable jury could return a verdict other than that the UPS's warning, work assignment restriction, and follow-up with Bedenfield were proportional and reasonably calculated to end the harassing conduct and to prevent future harassing behavior. *See Scarberry v. ExxonMobil Oil Corp.*, 328 F.3d 1255, 1259-60 (10th Cir. 2003).

With the Parker incident, UPS immediately acted on the plaintiff's complaint sending Parker home to complete EAP treatment and not allowing her back unless treatment was successfully completed. As confirmed in her own written complaint and her testimony about the matter, Bedenfield believed Parker's very

behavior evidenced being under the influence of something in assaulting Bedenfield during a pre-shift meeting attended by other employees and supervisors. After the incident, the plaintiff met with HR and was told that Parker would not be back to work for some time and would only return if treatment was successfully completed. Parker was off work for a month successfully completing the treatment and returned to work only after submitting a fitness report from her healthcare provider. UPS allowed Parker to return to work but directed that she would never be assigned to work in the same area as Bedenfield. While there may have been a prior incident of Parker acting strangely at work, the plaintiff has no admissible evidence this prior incident involved sexually harassing conduct. There is no evidence of record that Parker ever harassed or inappropriately touched another UPS employee except this one event, when Parker was obviously under the influence of something. Thus, the plaintiff fails to show that the UPS acted unreasonably in handling this situation principally as an employee with a substance abuse problem. The removal from work, the successful EAP treatment condition, and the work assignment restriction were proportional and reasonably calculated to end the harassing conduct and to prevent future harassing behavior.

Bedenfield testified seeing Parker come into her area and seeing Parker wait outside in the parking lot for her ride home. There is no evidence to suggest this is harassing conduct. Instead, the evidence is uncontroverted that Parker never said anything to the plaintiff and never touched her after this incident. The plaintiff offers no evidence that Parker confronted, threatened, or engaged in other conduct constituting harassment of Bedenfield. The plaintiff expresses her opinion that UPS

should have terminated Parker or should have kept her more informed about its handling of Parker's situation. The plaintiff's opinion by itself is not enough to carry her burden of showing that a reasonable jury could find UPS's response here was unreasonable. Instead, UPS's response addressed an employee with an apparent substance abuse problem who, when under the influence, engaged in behavior that had never been displayed at work. The UPS also worked to protect the plaintiff by restricting work assignments to limit interaction. Nor is there any evidence suggesting that the HR department was not ready to address any further ongoing complaints from Bedenfield if she had made them. The plaintiff has failed to present evidence from which a jury could reasonably find that in dealing with Parker UPS had acted unreasonable prior to and after Bedenfield's complaint of sexual harassment. UPS is entitled to summary judgment on the plaintiff's hostile work environment claim.

In the alternative, the court would grant summary judgment in that the evidence of record shows the plaintiff cannot prove these isolated events are pervasive or severe enough to alter the terms and conditions of her employment. Notwithstanding the severity of Parker's assault, the evidence shows the incident was largely a substance abuse problem which UPS addressed. There is no evidence of any contacts between the plaintiff and Parker after the single incident. The plaintiff kept working more than three months after Parker's return to work, and she presents no evidence that Parker's presence otherwise interfered with her work. The plaintiff's subjective and vague feelings of uncertainty and insecurity from occasionally seeing Anthony and Parker in or near her work area are not enough. *See Throupe*, 988 F.3d at 1252 ("It is not enough that the plaintiff perceived the conduct to be severe or

pervasive.") Under the totality of the circumstances, a reasonable jury could not find severe or pervasive conduct here because the incidents were isolated, were immediately addressed and remediated, and did not unreasonably interfere with the plaintiff's work performance.

IT IS THEREFORE ORDERED that the defendant UPS's motion for summary judgment (ECF# 34) is granted.

Dated this 31st day of March, 2021, Topeka, Kansas.


s/Sam A. Crow
Sam A. Crow, U.S. District Senior Judge